AO 108 (Rev. 06/09)  Application for a Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT
## for the
### District of Columbia

| | |
|---|---|
| In the Matter of the Seizure of<br>*(Briefly describe the property to be seized)*<br>THE DOMAIN UPWORKSELL.COM<br>PURSUANT TO 18 U.S.C. §§ 981(a)(1)(A) &<br>(C), 982(a)(1), AND 28 U.S.C. § 2461 | ) <br> ) <br> ) <br> ) <br> ) <br> Case No.    24-sz-20 |

## APPLICATION FOR A WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the ___Jurisdiction of the___ District of ___Columbia___ is subject to forfeiture to the United States of America under ___

18 U.S.C. §§ 981(a)(1)(A) & (C), 982(a)(1), and 28 U.S.C. § 2461, as property involved in or proceeds of violations of 18 U.S.C. § 371, 18 U.S.C. §§ 1343 & 1349, 18 U.S.C. § 1028A, 18 U.S.C. § 1028(a)(b), 8 U.S.C. § 1324a, 18 U.S.C. § 1956(h), and 18 U.S.C. § 1960
(describe the property): See Attachment A, hereby incorporated by reference.

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE.

☐ Continued on the attached sheet.

_____
*Applicant's signature*

Raymond Yi, Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

2024.05.09
11:34:47
-04'00'

Date: ___5/9/2024___

_____
*Judge's signature*

City and state:  ___Washington, D.C.___

Robin M. Meriweather, United States Magistrate Judge
_____
*Printed name and title*

AO 109 (Rev. 12/09)  Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Seizure of<br>*(Briefly describe the property to be seized)*<br><br>THE DOMAIN UPWORKSELL.COM PURSUANT TO<br>18 U.S.C. §§ 981(a)(1)(A) & (C), 982(a)(1), AND 28<br>U.S.C. § 2461 | )<br>)<br>)<br>)<br>)    Case No.  24-sz-20<br>) |

## WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests that certain property located in the _____Jurisdiction of the_____ District of _____Columbia_____ be seized as being subject to forfeiture to the United States of America.  The property is described as follows:

See Attachments A, hereby incorporated by reference.

I find that the affidavit(s) and any recorded testimony establish probable cause to seize the property.

**YOU ARE COMMANDED** to execute this warrant and seize the property on or before _____05/23/2024_____
*(not to exceed 14 days)*

☑ in the daytime – 6:00 a.m. to 10:00 p.m.          ☐ at any time in the day or night, as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must also give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

An officer present during the execution of the warrant must prepare, as required by law, an inventory of any property seized and the officer executing the warrant must promptly return this warrant and a copy of the inventory to United States Magistrate Judge _____ .
*(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐ for _____ days *(not to exceed 30).*

☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:     _____05/09/2024_____

2024.05.09
11:35:07 -04'00'

*Judge's signature*

City and state:      _____Washington, D.C._____          Robin M. Meriweather, United States Magistrate Judge
*Printed name and title*

AO 109 (Rev. 12/09)  Warrant to Seize Property Subject to Forfeiture (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>24-sz-20 | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of:

Inventory of the property taken:

| Certification |
|---|

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

With respect to "UPWORKSELL.COM" ("TARGET DOMAIN"), NameSilo, LLC, who is the domain registrar for the TARGET DOMAIN, shall take the following actions to effectuate the seizure of TARGET DOMAIN:

1.      Take all reasonable measures to redirect the domain names to substitute servers at the direction of the Federal Bureau of Investigation, by associating the TARGET DOMAIN to the following authoritative name-servers:
        a.      hans.ns.cloudflare.com;
        b.      surina.ns.cloudflare.com; and/or
        c.      Any new authoritative name server or IP address to be designated by a law enforcement agent in writing, including e-mail, to the registrar.

2.      Prevent any further modification to, or transfer of, TARGET DOMAIN pending transfer of all right, title, and interest in TARGET DOMAIN to the United States upon completion of forfeiture proceedings, to ensure that changes to the TARGET DOMAIN cannot be made absent court order or, if forfeited to the United States, without prior consultation with the Federal Bureau of Investigation.

3.      Take all reasonable measures to propagate the necessary changes through the Domain Name System as quickly as practicable.

4.      Provide reasonable assistance in implementing the terms of this Order and take no unreasonable action to frustrate the implementation of this Order.

        The Government will display a notice on the website to which the TARGET DOMAIN will resolve. That notice will consist of law enforcement emblems and the following text (or substantially similar text):

        THIS DOMAIN HAS BEEN SEIZED BY THE FEDERAL BUREAU OF INVESTIGATION IN ACCORDANCE WITH A SEIZURE WARRANT ISSUED PURSUANT TO 18 U.S.C. §§ 981, 982 AND 28 U.S.C. § 2461(c) FOR VIOLATION OF 18 U.S.C. § 371, 18 U.S.C. § 1343 AND 1349, 18 U.S.C. § 1028A, 18 U.S.C. § 1028(a)(b), 8 U.S.C. § 1324a, 18 U.S.C. § 1956(h) BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA AS PART OF A JOINT LAW ENFORCEMENT OPERATION AND ACTION BY: THE UNITED STATES ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA AND THE FEDERAL BUREAU OF INVESTIGATION

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEIZURE OF THE DOMAIN UPWORKSELL.COM PURSUANT TO 18 U.S.C. §§ 981(a)(1)(A) & (C), 982(a)(1), AND 28 U.S.C. § 2461** | **SZ No. 24-sz-20**<br><br>**FILED UNDER SEAL** |

**Reference:**    *USAO Ref. # 2023R01240; Target Accounts: UPWORKSELL.COM*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEIZURE WARRANT**

I, Raymond Yi, a Special Agent with Federal Bureau of Investigation ("FBI"), being duly sworn, depose and state as follows:

**I.     INTRODUCTION**

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), currently assigned to the FBI New York Field Office. I have been a Special Agent with the FBI since December 2020. Since that time, I have been involved in national security investigations. Specifically, I have been involved in investigations involving counterintelligence, foreign agents, foreign influence, and counterproliferation. During my work with the FBI, I have participated in the execution of multiple search warrants, including warrants to search persons, premises, and email accounts.

2.      The facts in this affidavit come from my personal observations, my training and experience, information obtained from the knowledge and observations of other sworn law enforcement officers, either directly or indirectly through their reports or affidavits, surveillance conducted by law enforcement officers, information provided by witnesses, analysis of public records, analysis of social media information, and analysis of financial records.

3.      Because this Affidavit is being submitted for the limited purpose of establishing probable cause for the requested warrant, your Affiant has not set forth all of the relevant facts known to law enforcement officers.

4.      I make this affidavit for a warrant to seize the property described in Attachment A, specifically, the domain UPWORKSELL.COM ("the Target Domain").

5.      On April 29, 2024, this Court issued a complaint and arrest warrant for DIDENKO, on the basis of an Affidavit sworn by FBI Special Agent David Booth. *See* 24-mj-152 (MAU). This affidavit includes the same statement of probable cause as that submitted in support of the Complaint, with additional relevant information provided beginning in Section VI, regarding the Target Domain.

6.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that the Target Domain is property used or intended to be used to commit or facilitate violations of, *inter alia*, 18 U.S.C. § 371 (conspiracy to defraud the United States), 18 U.S.C. §§ 1343 & 1349 (wire fraud and wire fraud conspiracy), 18 U.S.C. § 1028A (aggravated identity theft), 18 U.S.C. § 1028(a)(b) (identity fraud), 8 U.S.C. § 1324a (employment of unauthorized alien in the United States), 18 U.S.C. § 1956(h) (money laundering conspiracy), and 18 U.S.C. § 1960 (unlicensed money transmitting business), which have been committed by OLEKSANDR DIDENKO and other known and unknown coconspirators.

7.      Further, there is probable cause to believe that the Target Domain is subject to seizure and forfeiture under 18 U.S.C. §§ 981, 982, and 28 U.S.C. § 2461(c).

8.      The procedure by which the government will seize the Domain Name is described in Attachment A hereto and below.

## II.     BACKGROUND ON DOMAIN NAMES

9.     Based on my training and experience and information learned from others, I am aware of the following:

10.     <u>Internet Protocol Address</u>: An Internet Protocol address ("IP address") is a unique numeric address used by devices on the Internet. Every device attached to the Internet must be assigned a public IP address so that Internet traffic sent from and directed to that device may be directed properly from its source to its destination. An IP address acts much like a home or business street address—it enables devices connected to the Internet to properly route traffic to each other. Devices connected to the Internet are assigned public IP addresses by Internet service providers ("ISPs"). There are two types of IP addresses: IPv4 (Internet Protocol version 4) and IPv6 (Internet Protocol version 6). An IPv4 address has four sets ("octets") of numbers, each ranging from 0 to 255, separated by periods (e.g., 149.101.82.209). An IPv6 address has eight groups ("segments") of hexadecimal numbers, each ranging from 0 to FFFF, separated by colons (e.g., 2607:f330:5fa1:1020:0000:0000:0000:00d1).

11.     <u>Domain Name</u>: A domain name is a string of text that maps to an IP address and serves as an easy-to-remember way for humans to identify devices on the Internet (e.g., "justice.gov"). Domain names are composed of one or more parts, or "labels," delimited by periods. When read right-to-left, the labels go from most general to most specific. The right-most label is the "top-level domain" ("TLD") (e.g., ".com" or ".gov"). To the left of the TLD is the "second-level domain" ("SLD"), which is often thought of as the "name" of the domain. The SLD may be preceded by a "third-level domain," or "subdomain," which often provides additional information about various functions of a server or delimits areas under the same domain. For

example, in "www.justice.gov," the TLD is ".gov," the SLD is "justice," and the subdomain is "www," which indicates that the domain points to a web server.

12.     <u>Domain Name System</u>: The Domain Name System ("DNS") is the way that Internet domain names are located and translated into IP addresses. DNS functions as a phonebook for the Internet, allowing users to find websites and other resources by their names while translating them into the IP addresses that their computers need to locate them.

13.     <u>Domain Name Servers</u>: Domain Name Servers ("DNS servers") are devices or programs that convert, or resolve, domain names into IP addresses when queried by web browsers or other DNS "clients."

14.     <u>Registrar</u>: A registrar is a company that has been accredited by the Internet Corporation for Assigned Names and Numbers ("ICANN") or a national country code top-level domain (such as .uk or .ca) to register and sell domain names. Registrars act as intermediaries between registries and registrants. Registrars typically maintain customer and billing information about the registrants who used their domain name registration services.

15.     <u>Registry</u>: A domain name registry is an organization that manages top-level domains, including by setting usage rules and working with registrars to sell domain names to the public. For example, the registry for the ".com" and ".net" top-level domains is VeriSign, Inc., which is headquartered at 12061 Bluemont Way, Reston, Virginia.

16.     <u>Registrant</u>: A registrant is the person or entity that holds the right to use a specific domain name sold by a registrar. Most registrars provide online interfaces that can be used by registrants to administer their domain names, including to designate or change the IP address to which their domain name resolves. For example, a registrant will typically "point" their domain name to the IP address of the server where the registrant's website is hosted.

17.    <u>WHOIS</u>: WHOIS is a protocol used for querying databases that store registration and other information about domains, IP addresses, and related Internet resources. For example, results from a WHOIS search of a domain would likely include contact information for the registry, the registrar, and the ISP that owns the IP address to which the domain points. Contact information for the registrant of the domain might be provided but is often redacted, masked, or inaccurate.

## III.    STATUTES AND BACKGROUND

### A.    Relevant Criminal Statutes

18.    Under 18 U.S.C. § 371, it is illegal for "two or more persons [to] conspire . . . to commit any offense against the United States," to include fraud on the United States and its agencies.

19.    Under 18 U.S.C. § 1343 it is illegal "to devise[] or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice." Under 18 U.S.C. § 1349, it is illegal to conspire to commit offenses under § 1343.

20.    Under 18 U.S.C. § 1028A it is illegal to "transfer[], possess[], or use[], without lawful authority, a means of identification of another person" in relation to commission of another felony, to include violation of 18 U.S.C. § 1343 (wire fraud).

21.    Under 18 U.S.C. §§ 1028(a)(7), (b)(1)(D), (c)(3)(A) & (f), it is illegal for any person to "knowingly transfer, possess, or use, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable

State or local law," and conspire to do the same.

22. Under 8 U.S.C. § 1324a, "it is unlawful for a person or other entity to hire, or to recruit or refer for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien."

23. Under 18 U.S.C. § 1956 it is illegal to, "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conduct or attempt to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity;." 18 U.S.C. § 1956(a)(1)(B)(i). It is also illegal to "transport[], transmit[], or transfer[], or attempt[] to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States . . . with the intent to promote the carrying on of specified unlawful activity," to include violation of 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 1028(a) (identity theft). 18 U.S.C. § 1956(a)(2)(A). Under 18 U.S.C. § 1956(h), it is illegal to conspire to commit offenses under § 1956.

24. Under 18 U.S.C. § 1960, it is illegal to knowingly conduct, control, manage, supervise, direct, or owns all or part of an unlicensed money transmitting business.

**B. U.S. Government Agencies**

25. The Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (USCIS) is the federal agency responsible for ensuring employment eligibility for workers in the United States. DHS and USCIS are located in the District of Columbia.

a.  Federal law requires that every U.S. employer who recruits, refers for a fee, or hires an individual for employment in the United States must complete Form I-9, Employment Eligibility Verification. A Form I-9 must be completed for every individual hired for employment in the United States, including citizens and noncitizens. On the form, an employee must attest to their employment authorization. The employee must also present their employer with acceptable documents as evidence of identity and employment authorization. The employer must examine these documents to determine whether they reasonably appear to be genuine and relate to the employee, then record the document information on the employee's Form I-9. Employers must have a completed Form I-9, Employment Eligibility Verification, on file for each person on their payroll (or otherwise receiving remuneration) who is required to complete the form.

b.  As a voluntary alternative to the Form I-9 process, employers may use E-Verify, a web-based system run by USCIS that compares information from Form I-9 to government records to confirm that an employee is authorized to work in the United States. In the E-Verify process, employers create cases based on information taken from an employee's Form I-9, Employment Eligibility Verification. E-Verify then electronically compares that information to records available to DHS and the Social Security Administration. E-Verify generates a response to the employer confirming the employee's employment eligibility or indicating that the employee needs to take further action to complete the case. Although E-Verify requires the use of a photographic identity document, it does not have the ability to query state drivers' license photographs against the state drivers' license databases.

c. Prior to August 2023, U.S. employers were generally required to review employment eligibility documents in person. After August 2023, employers could remotely examine and submit the employment eligibility documentation through E-Verify.

26.     The Internal Revenue Service (IRS) is the federal agency responsible for collection of taxes from U.S. employers and employees. IRS is located in the District of Columbia. Generally, U.S. employers withhold federal taxes from the pay checks of their employees and transmit those funds to the United States government. Generally, U.S. employers transmit to IRS reports of the total wages earned and the total taxes withheld for each calendar year. Generally, U.S. employees are responsible for determining their tax liability based on the amount of wages earned in the tax year and the amount of taxes withheld.

27.     The Social Security Administration (SSA) is the federal agency responsible for administering retirement, disability, survivor, and family benefits, and enrolling eligible individuals in Medicare. SSA also provides Social Security Numbers, which are unique identifiers needed to work, and a database of which is used to verify employment eligibility by the E-Verify system. Generally, U.S. employers withhold federal social security taxes from the pay checks of their employees and transmit those funds to the United States government. Generally, U.S. employers transmit to SSA reports of the total wages earned and the total social security taxes withheld for each calendar year. Generally, U.S. employees are eligible for benefits from SSA on the basis of this reported information.

**C.  Seizure and Forfeiture Statutes**

28.     This application seeks a seizure warrant under both civil and criminal authorities.

29.     Pursuant to 18 U.S.C. § 981(b), property subject to forfeiture under § 981 may be seized via a civil seizure warrant issued by a judicial officer "in any district in which a forfeiture action against the property may be filed," if there is probable cause to believe the property is subject to forfeiture.  Section 982(b)(1) incorporates the procedures in 21 U.S.C. § 853 [other than subsection (d)] for all stages of a criminal forfeiture proceeding.  Section 853(f) permits the government to request the issuance of a seizure warrant for property subject to criminal forfeiture. Thus, seizure warrants may be obtained outside of the district where the property to be seized is located.

30.     Pursuant to 18 U.S.C. § 981(a)(1)(C) & (D)(vi) and 28 U.S.C. § 2461(c), any property, real or personal, which "constitutes or is derived from proceeds traceable" to (i) a "specified unlawful activity" within the meaning of the money laundering statute (18 U.S.C. § 1956(c)(7)), (ii) fraud by wire, radio, or television (18 U.S.C. § 1343), and (iii) fraud and related activity in connection with identification documents, authentication features, and information (18 U.S.C. § 1028) is subject to civil forfeiture.

31.     Pursuant to 18 U.S.C. § 982(a)(2)(B), any property constituting, or derived from proceeds a person obtained directly or indirectly, as the result of a violation of, or a conspiracy to violate, fraud and related activity in connection with identification documents, authentication features, and information (18 U.S.C. § 1028), is subject to criminal forfeiture. Pursuant to 18 U.S.C. § 982(a)(3)(F), any property constituting, or derived from proceeds traceable to a violation of the prohibition of fraud by wire, radio, or television (18 U.S.C. § 1343) is subject to criminal forfeiture.

32.     Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, "involved in a transaction or attempted transaction" in violation of 18 U.S.C. §§ 1956, 1960, or any property "traceable to such property" is subject to civil forfeiture.

33.     Pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, "involved in" a violation of 18 U.S.C. §§ 1956, 1960, or any "property traceable" to such property is subject to criminal forfeiture.

## IV.     **JURISDICTION AND VENUE**

34.     Act and omissions in furtherance of the offenses alleged herein occurred within the District of Columbia, and this Court has venue under 18 U.S.C. § 3237. Specifically, as described further herein, (i) individuals failed to obtain a license to operate as a money transmitting business from the Secretary of the Treasury, located in this District; (ii) overseas individuals fraudulently submitted documentation to work in the United States to U.S. employers, to include employers located in the District; (iii) false information was conveyed to government agencies located in the District. *See In the Matter of the Search of Multiple Email Accounts Pursuant to 18 U.S.C. § 2703 for Investigation of Violation of 18 U.S.C. § 1956 et al*, 585 F. Supp. 3d 1, 14 (D.D.C. 2022) (venue for bank fraud lies in the District where the targets' concealment of material facts and misrepresentations to the financial institutions "caused these banks to not properly detect and report the nature of Targets' funds to D.C.-based regulators," and thereby exposed the banks to potential liability under the Bank Secrecy Act and the money laundering statute).

35.     Additionally, the scheme was begun and committed outside of the jurisdiction of any particular state or district of the United States, but within the extraterritorial jurisdiction of the United States, and this Court has venue under 18 U.S.C. § 3238. Specifically, overseas workers conspired between themselves and with individuals located in the United States to engage in a

scheme whereby they would work remotely in the United States without proper authorization and through the submission of fraudulent information, and then caused those funds to be sent to their accounts through U.S. persons.

36.     Under 18 U.S.C. § 981(h) provides that, in the case of property of a defendant charged with a violation that is the basis for forfeiture of the property under this Section, venue for civil forfeitures brought under this section lies in the district either where the defendant owning the property is located or in the judicial district where the criminal prosecution is brought.

37.     Pursuant to 18 U.S.C. § 981(b), property subject to forfeiture under § 981 may be seized via a civil seizure warrant issued by a judicial officer "in any district in which a forfeiture action against the property may be filed," if there is probable cause to believe the property is subject to forfeiture. Section 982(b)(1) incorporates the procedures in 21 U.S.C. § 853 [other than subsection (d)] for all stages of a criminal forfeiture proceeding. Section 853(f) permits the government to request the issuance of a seizure warrant for property subject to criminal forfeiture. Thus, seizure warrants may be obtained outside of the district where the property to be seized is located

V.      **PROBABLE CAUSE**

38.     The United States is investigating **OLEKSANDR DIDENKO**, also known as "Alexander Didenko" (DIDENKO), a Ukrainian national, last known to reside in Kyiv, Ukraine, as well as identified and unidentified co-conspirators, for a scheme in which persons are fraudulently obtaining employment with U.S.-based companies for monetary gain through use of U.S.-based websites and companies, and illegally using the U.S. financial system in furtherance of the same. As further explained here, financial records of DIDENKO show transactions related to the scheme as early as January 2018, and through the present day.

A. **Background**

39.     UpWorkSell is a business that purports to provide services to remote Information Technology (IT) workers. UpWorkSell uses a publicly-available website, https://upworksell.com (UpWorkSell). I have reviewed the UpWorkSell website, which advertises the ability for remote IT workers to buy or rent accounts in the name of identities other than their own on various online freelance IT job search platforms. Freelance platforms advertised on UpWorkSell include "U.S. Platform-1",[1] located in California, "U.S. Platform-2", located in Pennsylvania, and "Overseas Platform-1," located abroad. These platforms have internet websites that generally allow users to advertise thereon as "gig" workers, *i.e.*, to create free accounts, advertise their skills, and bid on IT work contracts. Generally, money for a contract is held in escrow by the platform and released as payment as the IT worker meets contract milestones. The UpWorkSell website also advertises "Credit Card Rental" in the European Union and the United States, SIM card rental for cellular phones, and the ability to buy or rent accounts at online Money Service Transmitters (MST) located in the United States and abroad. Thus, the UpWorkSell website appears to advertise a full array of services to allow an individual to pose under a false identity and market themselves for remote IT work.

40.     UpWorkSell is operated by DIDENKO. The UpWorkSell website lists the following "Contact" information: (1) email address ███████gmail.com ("Email Account-1"); and (2) Telegram handle @ ███████████ Subscriber records received for Subject Account 1 listed email address ██████@gmail.com ("EmailAccount-2") and phone number

---

[1] U.S. Platform-1's terms of service state that by registering for an account, the user represents that they are doing business under their own name. Users agree not to provide false or misleading information about their identity or location, or about the beneficial owner(s) of their business.

████████5089 ("Phone Number-1") as the recovery methods for "Email Account-1". U.S. Department of State records for a May 2023 visa application for DIDENKO show that DIDENKO listed Email Account-2 and Phone Number-1 as his contact information. Additionally, business records of a U.S. MST located in New York (U.S. MST-2) for an account belonging to DIDENKO show that Email Account-2 and Phone Number-1 are listed as the primary methods of contact.

41.     As explained further herein, evidence collected during the investigation reveals that DIDENKO manages as many as approximately 871 proxy identities, provides proxy accounts for 3 freelance IT hiring platforms, and provides proxy accounts for 3 different MSTs. In coordination with co-conspirators, DIDENKO facilitates the operation of at least 3 U.S.-based "laptop farms"[2] hosting approximately 79 computers. DIDENKO's 3 MST accounts, which he uses to send and receive funds in furtherance of the scheme, have received approximately $920,000 in U.S.D. payments since July 2018.

### Services Provided by Didenko

42.     DIDENKO provides access to proxy financial accounts, including online MSTs based in California ("U.S. MST-1"), New York (U.S. MST-2), and overseas ("Overseas MST-1"). Based on my review of the websites for these institutions, these MSTs operate on the internet and permit users to send and receive funds and have access to the U.S. financial system without having to open an account at a brick-and-mortar bank. U.S. MST-2 and Overseas MST-1 offer virtual bank accounts connected to the U.S. financial system and the ability to transfer funds internationally. I know from my experience in this and other investigations that having such accounts allows remote

---

[2] As described further herein, a laptop farm is a location in the United States used by remote IT workers to host computers provided to them by employers, in order to create the appearance that the remote IT workers are physically located at the laptop farm address.

workers to receive payments from U.S.-based employers domestically, and thus can give them the appearance of being located in the United States, obfuscating their true location.

43.     UpWorkSell's website also offers to create "credit cards" and then rents the use of those cards to his customers. Based on a review of records from a court-authorized search of DIDENKO's email, the customer sends money to DIDENKO to be loaded onto the card. DIDENKO then provides the card information to the customer after taking a pre-determined amount as a usage fee.

44.     Based on a review of records from a court-authorized search of DIDENKO's "Online Message Provider-1" account chats ("Online Message Provider-1 Account") , DIDENKO also offers customers, for a fee, the ability to access freelance worker accounts and the above-mentioned financial accounts via a remote computer desktop program. Email records indicate that DIDENKO's associates operate "laptop farms" in several countries, to include the United States. At these locations, DIDENKO's associates receive computers from the business by whom the remote IT workers are hired and keep them connected to the internet. DIDENKO provides clients (the IT workers) with credentials to remotely log in to these computers. The Internet Protocol ("IP") addresses associated with these computers will resolve to the "laptop farm" location, allowing the remote IT worker to appear as if they are physically located within the country in which they are allegedly working.

45.     Based on my training and experience, companies will often block IP addresses that are known to belong to sanctioned countries or proxy services like Virtual Private Networks (VPNs).

46.     Based on my training and experience, an individual may seek the services DIDENKO offers on UpWorkSell because he/she would not otherwise be able to obtain freelance

IT employment if he/she registered for freelance job websites and financial accounts by disclosing his/her true identity and true location.

47.    DIDENKO sells the use of real identities, which may be those of witting or unwitting individuals. A court-authorized search of DIDENKO's email (Email Account-2) revealed a spreadsheet listing approximately 871 identities linked to accounts with U.S. Platform-1, Overseas Platform-1, and U.S. MST-2. The search also revealed folders containing photos of passports, driver's licenses, bank statements, and other identity documents. Many of these photos depict an individual holding their identity document and a handwritten sign with a date. Based on my training and experience these types of documents and photos are often required to verify accounts on the above-mentioned platforms (and thus the individuals in the photos are likely witting participants in the scheme). Additionally, multiple documents in Email Account-2 appear to be interview scripts with answers to interview questions that are commonly asked via U.S. Platform-1's video verification process.

48.    Witting participants who are renting out their identities through DIDENKO are used to coordinate video job interviews on behalf of DIDENKO's customers. For example, a review of Online Message Provider-1 messages from a court-authorized search of Online Message Provider-1 Account shows that, in January 2020, DIDENKO had an exchange with an unidentified customer ("Customer-1") in which Customer-1 asked DIDENKO to create an Overseas Platform-1 account and asked if, "Female can do video interview with some clients?" "I mean, she can manage the interview with her technical skills?" DIDENKO responded, "usually not" "they can just talk" "you write – they answer". Later in the conversation, DIDENKO wrote, "we can create a second guy profile if you want. He knows English well and can help with client interviews . . . . [Y]ou will have to pay for each such interview, but he is a good guy."

*U.S.-Based Co-Conspirators and "Laptop Farms"*

49.     As described above, a laptop farm is a location hosting multiple computers all connecting to the internet through the same network, wherein individuals at the laptop farm assist remote individuals with logging on to the computers. This practice makes it appear that the remote individual is physically located at the location of the laptop farm, as the IP address for the laptop will be that of the laptop farm. Based on my training and experience, U.S. companies sometimes monitor the IP addresses of remote IT workers; a company would find it suspicious if an IT worker claiming to be located in the United States used a foreign IP address.

50.     A review of messages in Online Message Provider-1 Account shows that DIDENKO is operating "laptop farms" in the United States. The messages show that, when DIDENKO's customers request an account associated with a U.S. identity and are then employed by a U.S. company, DIDENKO provides them a location in the United States that will host the company-provided computer for a fee. To accomplish this, DIDENKO works with U.S.-based co-conspirators who receive computers, set up the computers, and maintain the computers' internet connection. The participation of these co-conspirators is essential to the scheme to deceive U.S. companies hiring remote IT workers because the U.S. companies typically only ship a computer for the IT worker's use to a U.S. address when the IT worker claims to be located in the United States. On behalf of his customers, DIDENKO facilitated the shipment of remote IT worker computers to multiple U.S. locations:

51.     **"U.S. Address-1"** –A review of messages from Online Message Provider-1 Account shows that in September 2023, DIDENKO had an exchange with an unidentified customer ("Customer-2") in which Customer-2 asked for help in receiving a computer in the United States. DIDENKO replied by providing U.S. Address-1 and the name of U.S. Co-

Conspirator-1. Approximately three days later, Customer-2 sent DIDENKO a message containing a tracking number for a package being sent to U.S. Co-Conspirator-1 at U.S. Address-1. Approximately two days later, DIDENKO sent Customer-2 a message, "Hi! Your USA PC is activated." "We can provide anydesk[3] access." "200$ is prepayment".

52.     Virginia driver's license records for U.S. Co-Conspirator-1 list U.S. Address-1 as the residence address. Based on records of the DHS, U.S. Co-Conspirator-1 is a Ukrainian national who previously had a J1 visa and departed the United States in September 2016. In June 2022, U.S. Co-Conspirator-1 was lawfully admitted to the United States.

53.     As previously described, Email Account-2 included a spreadsheet of proxy identities; the spreadsheet lists U.S. Co-Conspirator-1's name as being associated with an Overseas Platform-1 account and a U.S. MST-2 account. Email Account-2 contained an image of U.S. Co-Conspirator-1's passport, which according to U.S. MST-2's records was used to verify her account at U.S. MST-2.

54.     According to records of U.S. MST-1, between February and December 2023, DIDENKO's U.S. MST-1 account remitted 16 payments to U.S. Co-Conspirator-1's U.S. MST-1 account totaling $2,030.53. Of the 16 payments, 13 were $100 payments.

55.     **"U.S. Address-2"** – A review of emails found in Subject-Account 2 shows that, in November 2023, DIDENKO was forwarded an email containing confirmation of a laptop shipment that arrived at U.S. Address-2 under the name of "U.S. Co-Conspirator-2". Records of U.S. MST-1 show that on or about December 2, 2023, DIDENKO sent U.S. Co-Conspirator-2 $130. Records of U.S. MST-1 list U.S. Address-2 as an active address for U.S. Co-Conspirator-2's account.

---

[3] Based on my training and experience, and review of AnyDesk's website, AnyDesk is an application that allows users to log onto another laptop remotely through the AnyDesk application.

56.     A review of Online Message Provider-1 messages found in Online Message Provider-1 Account shows that, in October 2023, DIDENKO received via chat an inquiry from Customer-2 if he/she could have another computer sent to U.S. Co-Conspirator-1's address. DIDENKO responded, "Ofc you can, but let's use another address" and then provided U.S. Address-2 and the name of "U.S. Co-Conspirator-3". Approximately five days later, Customer-2 messaged DIDENKO with a tracking number for the shipment. The following day, DIDENKO messaged a confirmation that the laptop had been picked up.

57.     Tennessee driver's license records for U.S. Co-Conspirator-3 list a residence address in the same city as U.S. Address-2. Based on U.S. Department of State visa records , U.S. Co-Conspirator-3 is a Ukrainian national with an F1 visa.

58.     According to records of U.S. MST-1, on October 20, 2023, and October 31, 2023, DIDENKO's U.S. MST-1 account remitted payments of $8 and $50, respectively, to U.S. Co-Conspirator-3's U.S. MST-1 account.

59.     **"U.S. Address-3"** – A review of messages found in Online Message Provider-1 Account shows that, in November 2023, DIDENKO had an exchange with an unidentified customer ("Customer-3") in which Customer-3 wrote, "Hi, I need remote PC connection in US. Company will send PC in US." After DIDENKO responded, "We can help you". Customer-3 asked, "Which state and price?" DIDENKO answered, "[I]n california 400". Customer-3 asked, "[H]ow many PCs is he managing now". DIDENKO answered, "15 now". Later in the conversation, DIDENKO sent a message to Customer-3 with U.S. Address-3 and the name of "U.S. Co-Conspirator-4". Approximately two weeks later, Customer-3 messaged DIDENKO a shipping tracking number for a laptop shipment. Approximately two days later, DIDENKO messaged in reply, "The agent informed me 2 minutes ago that we received the package."

60.     Based on records of DHS, U.S. Co-Conspirator-4 is a Ukrainian national who arrived in the United States in June 2022 and was lawfully admitted to the United States.

***Other Co-Conspirators***

61.     A review of Online Message Provider-1 messages found in Online Message Provider-1 Account shows that often when DIDENKO communicates with customers who have problems logging into computers remotely, DIDENKO refers them to "Simon", the Technical Manager.

      a.   For example, in September 2023, Customer-2 asked DIDENKO via chat to "please check the internet connect". DIDENKO told Customer-2 to "please, ping simon". After Customer-2 asked, "who is simon", DIDENKO responded: "Technical Manager (He will help if your computer is offline or there are problems with the Internet)" and then provided an Online Message Provider-1 id and a Telegram handle for "Simon".

62.     A review of Online Message Provider-1 messages found in Online Message Provider-1 Account shows that if there are chat discussions about paying rent for access to U.S. MST-2 accounts, DIDENKO sometimes refers customers to "Denys", the Finance Manager.

      a.   For example, in December 2022, DIDENKO messaged Customer-2 via Online Message Provider-1 chat, "The payment date is fixed on the 13th of each month." "I am glad to introduce you to my financial manager Denys. From that moment, he will remind you about rent payments." "Please add it to your contacts. He has either already sent you an inquiry or will do it very soon." DIDENKO then provided an Online Message Provider-1 id and Telegram handle for "Denys".

63.     DIDENKO uses Trello to further the scheme. Trello is an online work management

tool which allows businesses and individuals to draft plans, collaborate on projects, organize operations and track progress of assigned tasks. Records obtained based on a search warrant of DIDENKO's email accounts revealed that DIDENKO had an account with Trello. Records obtained from a search warrant of this Trello account include screenshots of conversations that took place on other messaging platforms where users discuss payments and account suspensions. There are also screenshots of registrations for U.S. MST-2 accounts.

**B.   Examples of The Scheme**

64.    In an effort to succinctly illustrate DIDENKO's criminal conduct, this affidavit provides examples of DIDENKO's interactions to sell or rent accounts, the design of his infrastructure to support this scheme, the documentation kept to organize the scheme, and payment methods. A review of evidence gathered in the investigation shows that the goal of this scheme is to profit by providing remote IT workers with proxy accounts and proxy internet access in order for the IT workers to fraudulently gain employment and transfer employment income to foreign bank accounts.

65.    A review of Online Message Provider-1 messages between DIDENKO and an unidentified customer ("Customer-4") found in Online Message Provider-1 Account demonstrates the way the scheme was effected by DIDENKO:

*Creation of a Proxy U.S. Platform-1 Account*

a.   On or about May 31, 2023, Customer-4 requested to rent a U.S. Platform-1 account. DIDENKO responded, "we can help" "We recommend only Ukraine now. it's more safety". Customer-4 asked, "How much is it?" DIDENKO replied, "80$ is prepayment, 80$ per/m". DIDENKO provided options to pay him in USDT (Tether stablecoin cryptocurrency), BUSD (Binance stablecoin cryptocurrency), USDC

(USD Coin stablecoin cryptocurrency), and via U.S. MST-2. After some additional discussion, Customer-4 wrote: "i will pay now". DIDENKO wrote: "Your order is accepted. I think you will get it tomorrow."

b. On or about June 1, 2023, DIDENKO sent to Customer-4 remote computer login information, and email and U.S. Platform-1 login information for an account under the name "Ruslan Bairamov." The same email and password appears in aforementioned spreadsheet of proxy identities located in Email Account-2.

***Creation of a Proxy U.S. Platform-1 Account with a Stolen U.S. Identity***

c. In three instances, Customer-4 requested via Online Message Provider-1 chat that DIDENKO create U.S. MST-2 accounts with the name of an identified U.S. Person ("U.S. Person-1"). According to State Department records for a June 2021 application for a U.S. passport, U.S. Person-1 is a U.S. citizen born in Texas.

d. First, on or about June 2, 2023, Customer-4 wrote, "I hope to buy U.S. MST-2 account with my name. [U.S. Person-1]"

    i. Customer-4 stated, "I got a job offer with [U.S. Person-1]. They need bank account with [U.S. Person-1] name." DIDENKO responded, "We can create U.S. MST-2 account with your name. But we do not recommend it for use. It is not safe and we are not responsible for such an account. We have a lot of experience and recommend using accounts of real people. We have such accounts and we can sell or rent them. But in any case, if you need an account with your name, we can create it for you." Customer-4 replied, "I need bank account with same name. If not company does not accept it. I am going to use virtual bank in the U.S.

MST-2 account." After Customer-4 asked DIDENKO how much it would cost, DIDENKO wrote, "250$. Within 72h after prepayment." After additional discussion, DIDENKO wrote, "we will provide this acc asap" "and passport too". Customer-4 added, "i already bought driver licnese [sic] for 80 USD" "and SSN with 30 USD". Customer-4 sent DIDENKO a birthdate, a Texas address, and a photo, "if you need details for passport use these". In response to the photo, DIDENKO wrote, "No need" "the quality is not good. it will be clear that this is a fake passport."

ii.   On or about June 6, 2023, DIDENKO sent Customer-4 U.S. MST-2 login information, which included email address, ███████████ @gmail.com. This email appears in DIDENKO's spreadsheet of proxy identities next to the name of U.S. Person-1.

iii.   According to records of U.S. MST-2, on or about June 2, 2023, an account was registered with U.S. Person-1's name, email address ███████████ @gmail.com, and a Ukrainian passport.

e.   Second, in August 2023, Customer-4 asked for another account.

i.   On or about August 28, 2022, Customer-4 messaged DIDENKO "Just make [U.S. Person-1] U.S. MST-2." "But please make another passport for it. Do not use the previous passport you used for old [U.S. Person-1] U.S. MST-2." DIDENKO responded with methods to pay him and quoted a price of "250$".

ii.   On or about September 5, 2023, DIDENKO sent to Customer-4 U.S. MST-2 login information, which included email address:

████ @gmail.com. This email appears in DIDENKO's spreadsheet of proxy identities next to the name of U.S. Person-1.

    iii.   Records of U.S. MST-2 show that an account was registered on or about August 30, 2023, with U.S. Person-1's name, email address ████ @gmail.com, and a Ukrainian passport.

    iv.   The Ukrainian passports for the ████ @gmail.com and ████ @gmail.com U.S. MST-2 accounts had different photos but identical signatures. Based on my training and experience, this pattern is an indication that the passports were forgeries.

f.   Third, in October 2023, Customer-4 requested a third account.

    i.   On or about October 27, 2023, Customer-4 wrote to DIDENKO, "I request one more U.S. MST-2 with [U.S. Person-1]".

    ii.   On or about October 30, 2023, DIDENKO sent to Customer-4 U.S. MST-2 login information, which included email address: ████ @gmail.com. This email appears in DIDENKO's spreadsheet of proxy identities next to the name of U.S. Person-1.

    iii.   Records of U.S. MST-2 show that an account was registered on or about October 28, 2023, with U.S. Person-1's name, email address ████ @gmail.com, and a Ukrainian passport.

***Providing Remote Access to U.S.-Based Computers***

g.   On or about June 7, 2023, Customer-4 told DIDENKO via Online Message Provider-1 message, "I have got a job from US company. They are going to deliver computer this week. Can you help me with this? And he must be in

Texas." Based on my training and experience, U.S. companies sometimes mail a computer to a remote IT worker for use in completing a work contract.

h. On or about June 7, 2023, DIDENKO responded, "We can receive laptop in another state" and proceeded to provide an address for a commercial shipping service's "access point", i.e., a package pick-up/delivery location, in Virginia. DIDENKO quoted the fee as, "200$ is prepayment (when we get the laptop and you get access)" "200$ per/m". Customer-4 asked, "So when the company does shipping which receiver name do they have to write on it?" DIDENKO responded, "you can tell them to send parcel to your wife's name: [U.S. Co-Conspirator-1]". Customer-4 clarified that the company "will ship with [U.S. Person-1] name" "and a family member can receive it" "I introduced them [U.S. Co-Conspirator-1] is my wife". Approximately three weeks later, DIDENKO provided Customer-4 with remote log-in credentials for the computer.

i. On or about August 18, 2023, Customer-4 sent U.S. Address-1 to DIDENKO and asked, "Does this address work for laptop delivery?" "I provided this address." DIDENKO responded, "yes, sure".

j. On or about October 2, 2023, DIDENKO messaged Customer-4, "Hi! Friend, we have changed US address. Let me know when you need a new one". DIDENKO provided US Address-2 followed by, "New address to new PC's. You can use anyname".

C. **Financial Transactions**

66.     DIDENKO utilizes his U.S. MST-2 account to receive payments he earns from his

scheme.

      a.  For example, according to records of Online Message Provider-1 Account, on or about September 24, 2019, an unidentified customer ("Customer-5") messaged DIDENKO asking him to create a U.S. Platform-1 account. DIDENKO advised Customer-5 of the $170 prepayment amount, which included purchase of a computer, modem, and passport data. Customer-5 asked DIDENKO, "how should I pay for that prepayment?" DIDENKO responded [ U.S. MST-2". Customer-5 subsequently replied, "let me know your account email." "I will send now". DIDENKO then shared his email address, Email Account-2, which is directly linked to his U.S. MST-2 account.

      b.  Records of U.S. MST-2 show that, on or about September 24, 2019, DIDENKO's account received $170 from a U.S. MST-2 account based in China. Records of U.S. MST-2 also show that at least two additional U.S. MST-2 accounts were utilized to remit payments to DIDENKO for his services from Customer-5. These accounts were also based in China. In total, between approximately July 2019 and approximately April 2022, records of U.S. MST-2 show that DIDENKO's account received 148 payments totaling $23,773 between these known China-based accounts.

67.    DIDENKO also utilizes his U.S. MST-2 account to receive funds for his "credit card" services portion of his scheme.

      a.  For example, according to records of Online Message Provider-1 Account, on or about September 28, 2019, Customer-5 inquired about his U.S. Platform-1 account by asking, "1. before passing the [U.S. Platform-1] verification, shouldn't I make

profile completion percent 100%? 2. may I setup payment method? 3. as you know, the initial connects is only 20. can you charge $50 into the account, I will send payment for that?" DIDENKO responded, "no. it will be better if we make this payment by credit card", "you can send me funds and I will replenish the card". Customer-5 then replied, "I will send $100 now", "what is your U.S. MST-2] account?", "[Email Account-2]?" To which DIDENKO responded "ok".

    b. Records of U.S. MST-2 show that, on September 28, 2019, $100 was remitted from a China-based U.S. MST-2 account to DIDENKO's. On the same day, DIDENKO's U.S. MST-2 account transferred $100 to DIDENKO's linked Ukraine-based bank account affiliated with a payment card, "414949XXXXXX1010".

68. According to records of U.S. MST-2, DIDENKO utilizes multiple accounts to layer funds for his scheme. DIDENKO withdraws the funds held in his U.S. MST-2 account to the bank accounts based in Ukraine. DIDENKO had at least ten Ukraine-based bank accounts linked to his U.S. MST-2 account. Of these, four accounts were held under his name. Between in or about December 2018 and June 2022, DIDENKO withdrew a total of $202,422.83 from his U.S. MST-2 account to Ukraine-based bank accounts, including as follows:

    a. On March 3, 2021, a Ukraine-based U.S. MST-2 account ("U.S. MST-2 Account-1") transferred $150 to DIDENKO's account. On the same day, DIDENKO's U.S. MST-2 account transferred $150 to a Russia-based account ("Account-2").

    b. On April 16, 2021, U.S. MST-2 Account-1 transferred $1,425 to DIDENKO's account. On the same day, DIDENKO's account transferred $1,425 to Account-2.

    c. On September 27, 2021, a United Kingdom-based U.S. MST-2 account ("Account-3") transferred $1,876 to DIDENKO's account. On the same day, DIDENKO's

account transferred $1,876 to a Bosnia and Herzegovina-based U.S. MST-2 account ("Account-4").

d. Also on September 27, 2021, Account-3 transferred $1,992 to DIDENKO's account. On the same day, DIDENKO's account transferred $1,992 to Account-4.

69.    A review of messages found in Online Message Provider-1 Account shows that DIDENKO and his customers were aware the accounts are subject to scrutiny by U.S. authorities and/or U.S. MSTs.

a. For example, on September 6, 2022, DIDENKO's customer ("Customer-6") messaged DIDENKO asking, "can you exchange $2000 now?" "[U.S. MST-1] to U.S. MST-2 "same [U.S. MST-1]?" To which DIDENKO responded, "We can". Customer-6 then shared a screenshot of a payment confirmation of $2,000 to Oleksandr Didenko. When Customer-6 asked, "Is it holding now?" To which DIDENKO responded, "we do not recommend sending large amounts together. If would be better to break it up into smaller amounts. Now you need to wait for the transaction to be completed . . . ."

b. On September 6, 2022, a payment of $2,000 was initiated to be sent to DIDENKO's account and was finalized on September 8, 2022.

c. On May 12, 2023, DIDENKO's customer ("Customer-4") messaged DIDENKO asking, "Is it safe if I buy real person's U.S. MST-2 more than fake name?" To which DIDENKO responded, "of course".

d. On or about October 25, 2023, Customer-4 messaged DIDENKO asking, "The same payroll day I will get payment about 12k from two companies." "Is it safe then?" DIDENKO later responded, "if you able – better use another one U.S. MST-

2 acc for that".

e.  Based on my training and experience, DIDENKO and his customers were discussing a potential risk of account review and/or account closure by U.S. MST-2 due to suspicious financial activities in connection to the scheme.

**D.  <u>Use of Stolen U.S. Person Identities</u>**

70.    DIDENKO's scheme involves U.S. persons who are victims of identity theft or have loaned their identity out for use by others. A search of Subject-Account-2 revealed pictures of a several U.S. identification documents such as passports and driver's licenses. According to U.S. Department of State passport information, six of the U.S. passports found in DIDENKO's account were reported as either lost or stolen.

*U.S. Person-1*

71.    As stated, DIDENKO's Online Message Provider-1 chats with Customer-4 show that Customer-4 was using the identity of U.S. Person-1, a U.S. citizen born in Texas. U.S. Person-1's information was found on DIDENKO's spreadsheet of proxy identities.

72.    According to business records of U.S. Company-1, in August 2023, an identified U.S. Company ("U.S. Company-5") offered an employment contract to an individual posing as U.S. Person-1, who was using the email address ███████@gmail.com. U.S. Company-5 subsequently made payments to the U.S. MST-2 account for this U.S. Person-1 identity. The person posing as U.S. Person-1 provided U.S. Company-5 a signed I-9 Employment Eligibility Verification form and a signed IRS W-4 Employee's Withholding Certificate form. The employment records also included a Social Security card and a Texas driver's license for U.S. Person-1. The driver's license had a photo of an Asian male (which did not match the photo in the Ukrainian passport (a white male) used to create the U.S. MST-2 account in the name of U.S.

Person-1). State driver's license records revealed that the real U.S. Person-1 is a black male with a Texas address.

73.     Additionally, on or about April 25, 2024, your affiant interviewed a human resources (HR) representative for U.S. Company-6, a technology staffing company in Maryland. The HR representative noted that an IT worker using the identity U.S. Person-1 was hired on November 13, 2023, to work on a contract with a government agency. To verify employment eligibility, the IT worker posing as U.S. Person-1 provided a Texas driver's license with a picture of an Asian male, the same ID provided to U.S. Company-5. The HR representative also stated that the IT worker posing as U.S. Person-1 was on "disability leave" and needed to be fingerprinted for the contract with the government agency. Based on my training and experience, I know that IT workers perpetrating these schemes often tell employers that they have various calamities befall them or personal issues when they are required to do something for the employer that necessitates in-person contact. Based on records from E-Verify, on or about November 13, 2023, U.S. Company-6 submitted U.S. Person-1's identity documents to the E-Verify system and listed the email address associated with U.S. Person-1 as ▮▮▮▮▮▮@gmail.com."

74.     Additionally, based on records from E-Verify, on or about July 18, 2023, U.S. Company-7, a staffing company in Pennsylvania, submitted all the same information for employment of U.S. Person-1, to include the same email address. E-Verify records further show that, in March 2020, a Texas-based refinery submitted to E-Verify information about U.S. Person-1, with a different email address. Analysis of these records, to include the pre-pandemic employment in a different industry in U.S. Person-1's home state, thus, shows there is probable cause to believe that U.S. Person-1's identity was fraudulently submitted to both U.S. Company-6 and U.S. Company-7.

### *U.S. Person-2*

75.     Investigators interviewed U.S. Person-2, who is a U.S. citizen born in Pennsylvania. U.S. Person-2 stated that his/her identity had been stolen and that they had received various indications of the same, including a laptop from an identified U.S. Company ("U.S. Company-1") at his/her actual residence despite that U.S. Person-2 did not work for that company.

76.     According to business records of four U.S. companies, U.S. Person-2's identity was used to gain employment with multiple identified U.S.-based companies. U.S. Person-2's name, address, and Social Security Number were used to apply to four identified U.S. companies.

a.   Based on business records and an interview, in early January 2024, an unidentified male posing as U.S. Person-2 applied to an identified U.S. company ("U.S. Company-2"), specifically for a contract position with the U.S. government agency.

    i.   An employee of U.S. Company-2 conducted an interview with the individual claiming to be U.S. Person-2 and noticed the individual was an Asian male who spoke broken English. U.S. Person-2 is a white male. The individual requested a laptop be sent to U.S. Address-2, which is not U.S. Person-2's actual residence.

    ii.   According to U.S. Company-2's records, the company conducted a check for employment eligibility of U.S. Person-2 with DHS's E-Verify system, using the identity documents provided by the individual. The individual impersonating U.S. Person-2 provided a Pennsylvania driver's license with U.S. Person-2's name, date of birth, and address, but a different license number than that of the real U.S. Person-2's license.

    b.  Based on interviews, in or about March 2024, an unidentified individual posing as U.S. Person-2 had received a job offer at another identified U.S. company ("U.S. Company-3").

        i.  U.S. Company-3 conducted three video interviews of the individual who indicated he was based in Pennsylvania and was willing to relocate. U.S. Company-3 used a third-party to initiate the individual's background check, which he passed. U.S. Company-3 sent a prepaid debit card containing a relocation bonus as well as a laptop to the individual's requested address, U.S. Address-2. The individual initially requested for the relocation bonus to be deposited directly into his account, but eventually agreed for the prepaid debit card to be sent to the U.S. Address-2 per the policy of U.S. Company-3.

        ii.  Upon notification by U.S. Person-2 to U.S. Company-3 that the unidentified individual fraudulently used U.S. Person-2's identity to apply for the position, U.S. Company-3 terminated the unidentified individual's employment. The prepaid debit card funds had been already used for on-line purchases, rather than relocation expenses.

    c.  Based on an interview, in February 2024, an unidentified individual applied for employment at an identified U.S. company ("U.S. Company-4").

        i.  The unidentified individual used U.S. Person-2's name, a doctored license, and a counterfeit Social Security card, and provided a Tennessee residential address. U.S. Company-4 conducted I-9 verification of these documents, which were identified as false documents.

77.     U.S. Person-2's name appears in DIDENKO's spreadsheet of proxy identities where two accounts associated with his name are marked as "Sold". In December 2023, DIDENKO exchanged Online Message Provider-1 messages with Customer-4 in which Customer-4 requested DIDENKO create a U.S. MST-2 account in U.S. Person-2's name. In January 2024, Customer-4 asked, "Is Tenneessee [sic] delivery office working now?" "New laptop will be delivered soon" "Delivery name will be [U.S. Person-2]".

78.     Additionally, records of E-Verify show that four additional U.S. Companies (U.S. Company-8, -9, -10, -11), all submitted employment eligibility queries for workers posing as U.S. Person-2 between January 4, 2024, and March 11, 2024, with false documentation.

*U.S. Person-3*

79.     On or about September 22, 2023, DIDENKO exchanged Online Message Provider-1 messages on Subject Account 3 with an unidentified customer ("Customer-7"). Customer-7 informed DIDENKO, "I have shipped one equipment to VA address." A review of the Online Message Provider-1 conversation shows that this laptop was associated with an IT worker using the identity of U.S. Person-3, and was issued by U.S. Company-12, a staffing company.

80.     Business records of U.S. Company-13, a luxury retail chain, show that it contracted the IT worker posing as U.S. Person-3 for IT work between October 2, 2023, until November 17, 2023, through U.S. Company-12. A review of New York driver's license data and U.S. Department of State records shows that U.S. Person-3 is a U.S. citizen residing in New York.

**E.  <u>False Information Transmitted to the U.S. Government</u>**

81.     On or about the dates listed below, the remote IT workers who were customers of DIDENKO applied for employment with U.S. companies and caused the U.S. companies to transmit false information, to include false information about U.S. persons' identities and false

documents to USCIS via the E-Verify system, in order to verify employment eligibility:

| Sub-¶ | U.S. Person Identity | Date | Document 1 | State | Document 2 | Employer |
|-------|----------------------|------|------------|-------|------------|----------|
| a. | U.S. Person-1 | 7/19/2023 | State Driver's License/ID | TX | Social Security (SS) Card | U.S. Company-7 |
| b. | U.S. Person-1 | 11/13/2023 | State Driver's License/ID | TX | SS Card | U.S. Company-6 |
| c. | U.S. Person-2 | 1/2/2024 | State Driver's License/ID | PA | SS Card | U.S. Company-2 |
| d. | U.S. Person-2 | 1/9/2024 | State Driver's License/ID | PA | SS Card | U.S. Company-8 |
| e. | U.S. Person-2 | 2/21/2024 | State Driver's License/ID | PA | SS Card | U.S. Company-4 |
| f. | U.S. Person-2 | 2/22/2024 | State Driver's License/ID | PA | SS Card | U.S. Company-9 |
| g. | U.S. Person-2 | 3/6/2024 | State Driver's License/ID | PA | SS Card | U.S. Company-10 |
| h. | U.S. Person-2 | 3/13/2024 | State Driver's License/ID | PA | Birth Certificate | U.S. Company-11 |
| i. | U.S. Person-3 | 9/20/2023 | State Driver's License/ID | NY | SS Card | U.S. Company-12 |

82.     Further, the scheme has caused false information to be transmitted to IRS and SSA. Based on my training and experience, I know that U.S. companies are required to annually report wages and earnings to IRS and SSA for all their employees. As previously explained, U.S. Person-1's, U.S. Person-2's, and U.S. Person-3's identities were successfully used to gain employment and earn wages with at least 5 companies (U.S. Company-2, -3, -4, -6. -12). Moreover, a review of email records for Email Account-2 showed that at least 13 U.S. identities may have been compromised as part of the scheme. Thus, based on the foregoing, there is probable cause to believe that U.S. persons have had wages falsely reported to IRS and SSA as part of the scheme.

## VI.     THE TARGET DOMAIN

83.     As described above, the TARGET DOMAIN was used by OLEKSANDR DIDENKO to conspire to facilitate information technology (IT) workers fraud on companies in

the United States, Europe, and elsewhere, and the use of the U.S. financial system and wires as a means of the conspiracy.

84.     A search of publicly-available WHOIS domain name registration records revealed that the TARGET DOMAIN was registered on or about September 6, 2021 through the registrar NameSilo, LLC, which has its headquarters at 1300 E. Missouri Avenue, Phoenix, Arizona. Business records of NameSilo LLC show that TARGET DOMAIN was registered to username: ███ email: ███@host-ua.com, name: ████████, company name: Deroy LLC, address: 107 Fullsbury rd, Irmo, SC 29063, phone: ████5235, and IP: 91.201.202.45.

85.     The publicly-available WHOIS database lists the registrant of the TARGET DOMAIN as the organization PrivacyGuardian.org LLC. PrivacyGuardian.org LLC is an entity that allows website owners to keep their contact details private during the domain name registration process.

86.     The top-level domain for the TARGET DOMAIN is Verisign. Verisign currently manages all .com domains.

87.     Neither a restraining order nor an injunction is sufficient to guarantee the availability of the TARGET DOMAIN for forfeiture. By seizing the TARGET DOMAIN and redirecting it to another website, the Government will prevent third parties from acquiring the name and using it to commit additional crimes. Furthermore, seizure of the TARGET DOMAIN will prevent third parties from continuing to access the UPWORKSELL.COM websites in their present form.

88.     As set forth above, there is probable cause to believe that the TARGET DOMAIN is subject to civil and criminal forfeiture because it was used in the commission of violations of the SUBJECT OFFENSES.

## VII.    SEIZURE PROCEDURE

89.    As detailed in Attachment A, upon execution of the seizure warrant, the registrar for UPWORKSELL.COM, NameSilo, LLC, headquartered at 1300 E. Missouri Avenue, Phoenix, Arizona, shall be directed to restrain and lock the TARGET DOMAIN pending transfer of all right, title, and interest in the TARGET DOMAIN to the United States upon completion of forfeiture proceedings, to ensure that changes to the TARGET DOMAIN cannot be made absent court order or, if forfeited to the United States, without prior consultation with the FBI or the Department of Justice.

90.    In addition, upon seizure of the TARGET DOMAIN by the FBI, NameSilo, LLC will be directed to associate the TARGET DOMAIN to a new authoritative name server(s) to be designated by a law enforcement agent. The Government will display a notice on the website to which the TARGET DOMAIN will resolve indicating that the site has been seized pursuant to a warrant issued by this court.

## VIII.    CONCLUSION

91.    For the foregoing reasons, I submit that there is probable cause to believe that the TARGET DOMAIN is used in and/or intended to be used in facilitating and/or committing the SUBJECT OFFENSES. Accordingly, the TARGET DOMAIN is subject to forfeiture to the United States pursuant to, 18 U.S.C. §§ 981 and 982, and I respectfully request that the Court issue a seizure warrant for TARGET DOMAIN.

92.    Because the warrant will be served on NameSilo, LLC, which controls the TARGET DOMAIN., and NameSilo, LLC, thereafter, at a time convenient to it, will transfer control of the TARGET DOMAIN to the government, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

93.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for an Arrest Warrant. I submit that Assistant U.S. Attorney Steven B. Wasserman, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

Respectfully submitted,

Raymond Yi
Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me on this 9th day of May, 2024.

_____
ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE

2024.05.0
9 11:35:27
-04'00'